AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the
District of Colorado

|  |  |  |
|---|---|---|
| In the Matter of the Search of | ) | 18-sw-5-gpg |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) | Case No. |
|  | ) |  |
| 155 Merchant Drive, Montrose, CO 81401 more fully described in Attachment A, attached hereto, and to include all out-buildings and vehicles located thereon. | ) ) ) ) ) |  |

## APPLICATION FOR A SEARCH WARRANT

I, John Busch, a federal law enforcement officer, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit

located in the ____State and____ District of ____Colorado____, there is now concealed *(identify the person or describe the property to be seized):*

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*
- ☒ evidence of a crime;
- ☒ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 2314 | Interstate Transportation of Stolen Property |
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1341 | Mail Fraud |

The application is based on these facts:

X Continued on the attached affidavit, which is incorporated by reference.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*s/ John Busch*
*Applicant's signature*

____FBI Special Agent John Busch____
*Printed name and title*

Sworn to before me and: ☐ signed in my presence.
☒ submitted, attested to, and acknowledged by reliable electronic means.

Date: ___2/5/2018___

City and state: __Grand Junction, CO__

*Judge*

Gordon P. Gallagher, Magistrate Judge
*Printed name and title*

**ATTACHMENT A**

<sup>X</sup> **DESCRIPTION OF LOCATION TO BE SEARCHED**

Address: 155 Merchant Drive, Montrose, CO 81401

Legal Summary: Subd: COURT PARK FILING NO 2 Lot: 5 S: 20 T: 49 R: 9

Business Names: Sunset Mesa Funeral Directors, Sunset Mesa Crematory, Sunset Mesa Funeral Foundation, Donor Services Inc.

All vehicles at the property that can be shown to be owned, operated by, or in control of any of the listed businesses, business' employees, or business owners including, but not limited to, Megan Hess, Shirley Koch, and Alan Koch.  All garages, outbuildings, sheds, campers, recreational vehicles, trailers, receptacles, garbage cans, and storage containers that are located on the property.


(Main Building)


(Crematory/Outbuilding)

**ATTACHMENT B**

**DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED**

1. Any and all of the following items concerning; related to; or owned, operated, or held by:
   a. Megan Hess
   b. Shirley Koch
   c. Alan Koch
   d. Sunset Mesa Funeral Directors
   e. Colorado Cremation
   f. Sunset Mesa Cremation
   g. Sunset Mesa Funeral Foundation
   h. H2 Enterprises
   i. Any other business owned, operated, or controlled by the individuals listed in subparagraphs a-c above.

2. Dead human bodies and human body parts, to include, organs, tissues, bones, and parts thereof, whether fresh, frozen, embalmed, plastinated, or in some other state. Vials, jars, or containers of any sort appearing to contain human biological material, to include samples of drawn blood. Any and all DNA, tissue, or blood samples maintained. Freezers containing any of these materials, in order to keep the biological material properly preserved.

3. Any records or documentation regardless of date, in any format, reasonably believed to be associated with bodies or body parts, to include, but not limited to body part tags or labels (paper, cardboard, plastic, metal or other), body part inventory sheets, cadaveric demographic sheets, sales records, and shipping records.

4. Fingerprints of any deceased human hands and DNA tissue samples or DNA swabs needed for identification purposes.

5. Original willed-body donor files, cremation files, burial files, entombment files, removal from state files; including any and all associated documents, to include, but not limited to, death certificates, either official or unofficial and in any state of completion or redaction, any required forms to get death certificates, death worksheets, burial transit permits, donor self and/or next of kin consent forms, release forms, medical records, laboratory reports, records of use, records of storage, records of location, records of cremation or burial, records of donation, donor file checklists, physical exam forms, donor summary forms, medical facility face sheets, serology order forms and test results, cremated remains receipts, and donor suitability assessments.

6. Tissue/body part recovery/retrieval and distribution records to include, but not limited to, tissue distribution records, tissue recovery records/forms, processing records, transport records, summary of use forms, anatomical transfer agreements, requests for specimens, distribution inventory, transfer of cremated remains forms, first call reports/contact sheets, crematory logs, shipping records, client files – to include financial information.

7. Records associated with funeral homes, crematories, nursing homes, hospice, county coroner's offices, or any other health care facility or after death facility/organization in

reference to bodies used or to be used by the businesses listed above or businesses yet unknown.

8. Domestic and international records of training attendance, certificates, transcripts, diplomas, and degrees covering all aspects of post-secondary education to include colleges, community colleges, universities, seminars, certificate programs, online trainings, government hazardous materials and OSHA training records and other official trainings. Any documents in any form where references to academic degrees or professional licenses or certificates relevant to the listed individuals are found.

9. Shipping records to include, but not limited to, air waybills, customer broker documents, packages shipped, shipping accounts, and others.

10. Federal government records, applications, and supporting documents to include, but not exclusive to CDC, DOT, CBP, FDA and HSI. State, county, and local government records, applications, correspondence, or any other documents or records that are relevant to the listed individuals, entities, companies, owners, or their employees, assets, and transactions. These records should include, but are not limited to, any inspection records or enforcement actions in reference to any human body parts business, cremations business, or after life business.

11. Funeral home, crematory, and mortuary science records, professional licenses, and applications for such in any state of completion.

12. All contracts, billing agreements, professional service agreements, invoices, cadaveric bio-hazard forms, or any other contracts between the above mentioned companies or individuals and any other company, individual, or association.

13. All records related to any payments made to funeral homes, crematories, or individuals to induce any person to donate or sell their body or the body of another individual over which they have control, legal or otherwise.

14. Financial documents including but not limited to canceled checks, bank statements, deposit slips, 1099s, W2s, pay stubs, tax returns, and account receivable and payable related to, but not limited to the above listed entities and individuals. Documentation of assets owned. Documentation of transferred, or sold assets.

15. Any correspondence, facsimiles, hand written notes or documents pertaining to the above listed entities and other unknown companies.

16. Original employee records related to the above listed entities and other unknown companies.

17. Any ads, mailings, audio recordings, video recordings, writings, signs, signals, pictures, or packages related to the above listed entities and other unknown companies.

18. Any and all documents which relate to the legal and organizational structure of the above listed companies, regardless of date, or other companies unknown, including but not limited to:

    a. Organizational or corporate papers filed with the appropriate state agencies and any amendments thereto, including articles of incorporation, bylaws, and annual reports.

19. Photographs or videos in any format of facilities, cadaveric or body part processing, trainings, or anything concerning mortuary science, funeral homes, crematories, human body donation, medical seminars, foreign and domestic customers, employees, suppliers and affiliated business partners.

20. Travel records, itineraries, and travel receipts.
21. Records, in any media format, of recorded telephone conversations to included but not limited to donor consent conversations.
22. Any barcode scanners or readers or generators, and all associated equipment necessary to operate such devices.

Computer Evidence

23. Any of the before listed evidence contained within computers.
24. Computers, cell phone, or storage media used as a means to commit the violations described above.  For any computer, cell phone, or storage medium whose seizure is otherwise authorized by this warrant, and any computer, cell phone, or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):
    a. Evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;
    b. Evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;
    c. Evidence of the lack of such malicious software;
    d. Evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;
    e. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;
    f. Evidence of the times the COMPUTER was used;
    g. Passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;
    h. Documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;
    i. Records of or information about Internet Protocol addresses used by the COMPUTER;
    j. Records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;
    k. Contextual information necessary to understand the evidence described in this attachment.

DEFINITIONS:

As used above, the terms "records," "documents," "files," "programs," "applications," or "materials" includes records, documents, files, programs, applications or materials created, modified or stored in any form and by whatever means they may have been created and/or stored.  This includes any handmade (such as writing), photographic (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies), mechanical

(such as printing or typing), electrical, electronic, and/or magnetic forms. It also includes items in the form of computer hardware, software, documentation, passwords, and/or data security devices.

"Computer hardware" consists of all equipment that can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. This includes any data-processing devices (such as central processing units, memory typewriters, and self-contained "laptop" or "notebook" computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, transistor-like binary devices, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); related communications devices (such as modems, cables and connections, recording equipment, RAM or ROM units, acoustic couplers, automatic dialers, speed dialers, cellular telephones (also known as "mobile phones" and "smart phones," including iPhone, Android, and Blackberry devices, for the purposes of this search warrant), programmable telephone dialing or signaling devices, and electronic tone-generating devices); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

"Computer software" is digital information that can be interpreted by a computer and any of its related components to direct the way it works. Software is stored in electronic, magnetic, optical, or other digital form. It commonly includes programs to run operating systems, applications (like word-processing, graphics, or spreadsheet programs, utilities, compilers, interpreters, and communications programs).

"Computer-related documentation" consists of written, recorded, printed, or electronically stored material that explains or illustrates how to configure or use computer hardware, software, or other related items.

"Computer passwords and other data security devices" are designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

PROCEDURE:

In searching for data capable of being read, stored or interpreted by a computer, law enforcement personnel executing this search warrant will employ the following procedure:

a. Upon securing the premises, law enforcement personnel trained in searching and seizing computer data (the "computer personnel") will make an initial review of any computer equipment and storage devices to determine whether these items can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve the data.

b. If the computer equipment and storage devices cannot be searched on-site in a reasonable amount of time, then the computer personnel will determine whether it is practical to copy the data during the execution of the search in a reasonable amount of time without jeopardizing the ability to preserve the data.

c. If the computer personnel determine it is not practical to perform an on-site search or make an on-site copy of the data within a reasonable amount of time, then the computer equipment and storage devices will be seized and transported to an appropriate law enforcement laboratory for review.  The computer equipment and storage devices will be reviewed by appropriately trained personnel in order to extract and seize any data that falls within the list of items to be seized set forth herein.

d. In searching the data, the computer personnel may examine all of the data contained in the computer equipment and storage devices to view their precise contents and determine whether the data falls within the items to be seized as set forth herein.  In addition, the computer personnel may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the data falls within the list of items to be seized as set forth herein.

e. In order to search for data that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize and search the following items, subject to the procedures set forth above:

i. Any computer equipment and storage device capable of being used to commit, further or store evidence of the offenses listed above;

ii. Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

iii. Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants;

iv. Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software.

v. Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

vi. Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

vii. Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Special Agent John Busch, being duly sworn, hereby depose and state that the following is true to the best of my information, knowledge and belief:

## I. AGENT BACKGROUND

1. I am a Special Agent of the Federal Bureau of Investigation (FBI) and have been since 2015. Prior to my current position, I was a patrol officer and investigator during my five and a half year career in local law enforcement. I am currently assigned to investigate a wide variety of federal criminal violations to include interstate transportation of stolen property, wire fraud, controlled substance crimes, terrorism, bank fraud, public corruption, computer crimes, fraud against the government, child pornography, violent crime, and other violations.

2. As part of my duties, I investigate criminal violations occurring in the Western Slope of Colorado. I am the case agent on this case. As such, I am fully familiar with the facts of the case.

## II. PURPOSE OF AFFIDAVIT

3. This Affidavit is made in support of an application for a warrant to search the premises associated with Sunset Mesa Funeral Directors ("SMFD"); Sunset Mesa Funeral Foundation, Inc. ("Foundation"); Donor Services, Inc.; and Colorado Cremation, Inc.; (collectively "the entities"), as well as the owners/operators of the entities, Megan Hess, Shirley Koch, and Alan Koch (collectively "the individuals"). I respectfully submit that there is probable cause to believe that fruits, evidence, and instrumentalities relating to violations of Title 18, United States Code, Section 2314 (Interstate Transportation of Stolen Property); Title 18, United States Code, Section 1341 (Mail Fraud); and Title 18, United States Code, Section 1343 (Wire Fraud) will be found at the premises associated with the entities and the individuals, located at 155 Merchant Drive, Montrose, CO 81401 (Subject Property).

4.  The facts set forth in this affidavit are based on my personal knowledge; knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers; my review of documents and computer records related to this investigation; communications with others who have personal knowledge of the events and circumstances described herein; and information gained through my training and experience. This affidavit is intended to show that there is sufficient probable cause to search the location identified herein and described more fully in Attachment A, incorporated herein by reference, and seize the fruits, evidence, and instrumentalities described herein and described in Attachment B, incorporated herein by reference, and does not purport to set forth all of my knowledge of, or the investigation into, this matter.  I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary and applicable to establish the appropriate foundation of probable cause for the issuance of a search warrant.  I have not purposely omitted any fact(s) that undermine or are contrary to the opinions and conclusions set forth herein.

### III. BACKGROUND

5.  SMFD is a family owned and operated funeral home and crematory.  It is owned by Hess and operated by her and her parents, Shirley and Alan Koch.  SMFD is located at the Subject Property.  Co-located with SMFD is a human body parts harvesting and "body broker" business, also owned by Hess, named Donor Services.  Additionally, the Foundation—which is registered with the Colorado Secretary of State as a Nonprofit Corporation—is the parent entity of SMFD, Donor Services, and Colorado Cremation, as well as Delta Funeral Home and several other entities and trade names.

### A. CRIMES BEING INVESTIGATED

6.  I am submitting this affidavit in connection with an investigation into individuals and corporations trafficking in bodies, organs, tissues, and body parts of deceased human beings.

While this trade is not, in and of itself, illegal, there is probable cause to believe both that crimes have been committed and that evidence of these crimes will be found at the location to be searched.

7. Probable cause exists to believe that the above named individuals and entities have obtained human remains by fraudulent means, including but not necessarily limited to making false statements and promises in violation of Title 18, United States Code, Section 1341 (Mail Fraud) and 1343 (Wire Fraud). When remains cumulatively valued greater than $5,000 are obtained by fraud and are transported across state lines, this in turn is a violation of Title 18, United States Code, Section 2314 (Interstate Transportation of Stolen Property).

8. Probable cause also exists to believe that the above named individuals and companies have defrauded end users of human remains in violation of Title 18, United States Code, Section 1341 (Mail Fraud) and 1343 (Wire Fraud), by making false representations that (1) remains were tested for and free of certain infectious diseases, and (2) donors gave permission for the remains to be used at the locations and in the manner intended by end users.

## B. CREMATION

9. Cremation is often less costly than burial. The process is subjecting the deceased body to high-heat until it is reduced to ashes and other materials that cannot be fully consumed by the fire, such as metal medical devices and bone fragments. Metal in clothing the deceased are wearing at the time of cremation may survive the process and be present in the cremated remains, called cremains. Although cremains can be identified through testing as being human, it is difficult, if not impossible, to determine who was the source of human cremains. For this reason, when a body is cremated it is typically accompanied by a numbered metal tag that will not be destroyed by the fire. This tag number corresponds to an identically numbered metal tag on the container in which the cremains are to be put or to the tracking

paperwork accompanying the cremains.  After cremation, the cremains are typically returned to the family or next-of-kin of the deceased.

## C. HUMAN TISSUE DONATION

10. Based on my training and experience, I know (as do many others) that a deceased human body can supply essential and often lifesaving organs such as a heart, liver, or kidney, through the national organ donor program.  There is enormous demand for other body parts that fall outside of the well-regulated organ transplantation system.  There is also an ongoing need for human body parts for surgical training and medical device development.  This need for human body parts (which are often referred to as "human tissue," "human anatomical specimens," or "body segments") and the potential profits associated with such body parts, has led to the development of a gray and black market in dead human bodies and their constituent parts.  This market is comprised of group and individual entrepreneurs (both international and domestic) that receive whole body donations and then sell or lease them and their harvested parts to end-users.  Those that provide this service are sometimes referred to as "body brokers."

11. I know, based on my training and experience, that the deceased human body (particularly its component pieces) are used for everything from surgical training and medical device development and demonstration. For these types of uses, a human body can be valued between approximately $3,000 and $10,000 dollars.  The pricing depends on several factors, including whether the specimens are sold or leased, and whether it is a first, second, or further used of specimen.  Whole, fresh, uncut, human cadavers typically bring $5000 to $6000.  A human head (a "cephalus" in industry jargon), in contrast typically brings $500 to $800.

12. While federal law—namely Title 42, United States Code, Section 274—prohibits the buying and selling of human body parts for transplant or therapy.  Federal law does not prevent the

sale of human body parts for other purposes.  However, as with any profession, when unscrupulous methods are employed, other criminal offenses may be implicated.

13. Often the profits to be made in selling deceased bodies is far greater than any profits that could be attained from standard funeral/crematory charges.  As a result, investigations have revealed that some funeral directors or crematory operators attempt to maximize their profits by encouraging family members to donate the deceased by offering reduced fees or other incentives.  In some instances, consent to a donation is not even sought.  Investigations have revealed occasions where those who prepare bodies for cremation, funeral, autopsy at a medical examiners' offices, or dissection at a university, have secretly removed and sold human body parts without the consent of donors or their next-of-kin.  In such circumstances, violations of Title 18, United States Code, Sections 2314 (Interstate Transportation of Stolen Property), 1343 (Wire Fraud), and 1341 (Mail Fraud) may be implicated.

14. In addition to the above examples, I am aware of previous FBI investigations revealing that "body brokers" charged clients tens of thousands of dollars for body parts, while claiming to U.S. Customs that the same body parts had little or no value (if the body parts were claimed to Customs at all).  In such situations, the violations of federal law implicated can include Title 19, United States Code, Section 1497 (Failure to Declare an Item); Title 19, United States Code, Section 1436 (False Manifesting); and Title 13, United States Code, Section 305 (False Export Manifest).

15. Other FBI investigations revealed that some bodies sold by "body brokers" are diseased and/or otherwise classified as hazardous materials.  This has resulted in violations of Title 49, United States Code, Section 46312 (Transportation of Hazardous Material).

**IV. PROBABLE CAUSE**

16. In October 2017, the FBI began investigating Hess and her businesses after hearing of several complaints of fraudulent activity.  The investigation has revealed probable cause to

believe that the individuals and the entities are obtaining human bodies through fraud or

deception and then and transporting these bodies (either whole or dismembered) in foreign

and interstate commerce.  The investigation also reveals that the individuals and the entities

are using wire communications and mail to facilitate a scheme to defraud next-of-kin and

purchasers of donated human body parts.

17. During interviews with the FBI, several previous employees of the entities described Hess as

being in charge of the entire operation and all of its entities.  Shirley was described as

concentrating mostly on Donor Services.  Alan was described as mostly operating the

crematory.  Employees said that most business and business practices concerning Donor

Services were kept away from all of the employees.  Typically when there were discussions

about Donor Services between Hess, Shirley, and Alan, or with any clients of Donor

Services, they would be done in private.

## A. DONOR SERVICES EMPLOYEE INTERVIEW

18. In January 2018, I spoke with a former employee of Donor Services regarding the practices

of that business.  This employee worked closely with Shirley Koch between 2010 and 2013

to prepare body parts harvested from cadavers for later sale and delivery.[1]  The body parts

that the employee helped Shirley prepare ranged from entire bodies to limbs, torsos, or heads.

The employee described the general process as follows:

a.  When a body came in to SMFD, Shirley would check to see if any body parts were

suitable for harvest and subsequent sale; body parts that had been surgically repaired, for

example, were not good for "donation."  Shirley would cut up the bodies to take any body

---

[1] The FBI has been unable to locate any other employees of SMFD or Donor Services that
worked in this capacity.  Interviews with this employee and other former employees of the
entities indicates that Shirley Koch and Megan Hess were the main individuals that worked
directly with Donor Services.

parts that could be harvested; anything that could not be harvested for "donation" would be cremated.

b. The employee would clean, sew, wrap, and place the harvested body parts in a freezer. These body parts were wrapped in a special blue paper and the employee would write the deceased's name and what body part it was on the paper.

c. When an order came in for a particular body part, the employee and Shirley would box up the requested parts in cooler boxes and Alan Koch would take the boxes to Denver International Airport to be shipped off.

19. Prior to any processing of a body, Shirley was supposed to take a blood sample and send it off for analysis to determine if the body carried any infectious diseases. The employee said that Shirley did not always follow this procedure.

a. Sometimes Shirley did not take a blood sample at all. When blood samples were taken, Shirley would not wait for the results to process the body. The body would be processed and, many times, already shipped to whomever bought the body part before any blood results came back.

b. The employee recalled people with communicable diseases that were donated. In one specific incident, the blood work on a body that had already been processed and sold came back with hepatitis. The employee overheard Shirley comment to Hess that the blood work for the body showed hepatitis. The employee expressed concern that the employee or others could have contracted hepatitis from this body. Shirley told the employee, "Don't worry about it, just do your job, you won't get it." According to the employee, Shirley and Hess did not inform anyone (including the purchasers of the body parts) about the positive hepatitis results.

20. When a family or next of kin came in to SMFD to decide the disposition of a deceased's body, the employee said Shirley and Hess would push Donor Services hard. Even if people

said they did not want the body to be donated, Shirley and Hess would continue to push. They would tell the family that the body would help cure diseases and help progress science, and that the bodies would be donated.  The employee said that Shirley and Hess would never tell people that the bodies were sold for a profit.  If the next of kin decided that the body would be donated, they would fill out a Donor Services form.  The form included signatures, a copy of identification, and other line items.

21. Shirley and Hess kept records for all of the bodies that came through SMFD and Donor Services.  The records were kept in blue folders with the deceased's name on it, in files on Hess's laptop, and in files on Hess's office computer.  The bodies would be examined and information placed in the folders about the overall condition of the body and the body's ability to be harvested.  The files contain information regarding what body pieces were kept, shipping records of where they went, and, possibly, the prices paid.

22. The employee described the processing room as a production line for body parts.

   a.  The employee did not always know what the next of kin's wishes were when the employee was processing the bodies; the employee only knew what Hess and Shirley said about the deceased disposition (donation, cremation, burial, etc.).  The employee believed that most of the bodies that came in to SMFD left as donors.

   b.  The employee said that the entire time she worked for Donor Services there were only a handful of burials in which the body had not been processed for donation.  The employee said that all bodies arriving at SMFD would be evaluated for "donation" even before donation was agreed on by the next of kin.

   c.  SMFD would also receive bodies from other funeral homes.  The employee would be sent to pick up these bodies from the funeral and would be told that the bodies were to be brought back to SMFD for cremation, donation, or for funeral service.  Once the bodies arrived, Shirley and Hess would look at all of the bodies (regardless of the reported

disposition) to see if any parts could be donated.  Shirley would often call Hess for advice on salvaging or harvesting body parts.

d.  The employee recalled that, on one occasion, they processed ten bodies for donation in a single day.

e.  The employee said SMFD had four freezers to store the bodies and body parts.  However, many times these freezers would be completely full and they would have to store the bodies and body parts in the crematory building freezer.

23.  The employee said that remains of bodies that were not harvested for sale would be thrown in buckets and brought out to the crematory.  Often, body parts were mixed and cremated together.  The cremains would then be packaged and given to the families and presented as the decedent's cremains.

a.  The employee recalled that Hess and Shirley kept a large bag of ashes in the back that they would use to fill up small keepsake containers for the family of the deceased.  They would tell the families that the ashes were of their loved ones.  Hess and Koch did this over a long period of time and would fill the containers from the same bag of cremains for multiple different people.

b.  The employee recalled a specific instance, occurring sometime in the months before October 2013, in which the employee believed a decedent's cremains were not actually returned to the family.  Shirley and Hess were doing a funeral and the employee was on his/her own at SMFD.  Shirley and Hess told the employee that there was a family coming in to pick up cremains; Shirley said to give them to the family.  The cremains were in a black plastic square container with a piece of masking tape on it with the family's name.  The container was inside a paper bag that also had the family's name on it (the employee could not recall the family's name).  The employee recognized the name from "the board," meaning that a body with this name was in the cooler awaiting

processing.  The employee checked the cooler for the body and saw the body in its

entirety, unprocessed.  The employee gave the cremains to the family per Shirley and

Hess's direction.  The employee did not bring it up to Shirley and Hess because he/she

was afraid to confront them.

24. The employee also described other fraudulent activity.

    a.  The employee reported that Shirley never went to school to be an embalmer or body

       harvester; she learned on her own.  However, Shirley represented to others that she had

       certifications and qualifications to perform these activities.  The employee said that Hess

       has multiple professional certificates on her wall, but that they are all fake.

    b.  At times, the employee was asked to bring forms to the Montrose County offices in order

       to get death certificates.  The employee knew that the bodies had already been processed

       and shipped off prior to receiving any death certificates, and that this was against

       Colorado law.  Shirley and Hess would tell the employee, "If they ask, make sure you say

       they are still at the funeral home."

## B. VITAL STATISTICS RECORDS

25. In correspondence between the Colorado Office of the State Registrar of Vital Statistics and

the Mesa County Vital Records Office, I learned that other funeral homes using SMFD began

writing "NOT FOR DONATION" on the SMFD forms when bodies were picked up to be

cremated.  These funeral homes were suspicious that Hess and Shirley were treating the

bodies as "donated" even when that was not indicated.  They were also suspicious that Hess

and Shirley were falsifying donor documents because they were requiring the decedent's and

the next-of-kin's driver's licenses, which contain their signatures.

26. During the course of this investigation, I received a document from the Colorado Office of

the State Registrar of Vital Statistics listing information from death certificates for every

decedent processed by SMFD, Sunset Mesa Crematory, and Donor Services between January

1, 2015, and October 29, 2017. This information was populated from an online Electronic

Death Registration (EDR) system form that was completed by SMFD. EDR is a statewide

system that is used to input information necessary to obtain a death certificate. One field of

information is the Method of Disposition that describes whether a body was buried,

cremated, donated, entombed, etc. The document shows that between January 1, 2015, and

October 29, 2017, only forty-two decedents were donated to the entities.

27. The number of reported donations is inconsistent with employee reports of the number of

donations processed by SMFD and Donor Services. This number is also inconsistent with a

January 2017 Reuters news report in which Hess is quoted—from a conversation in 2016—

as handling "about 10 cadavers a month" in her donation business.

28. Additionally, Hess may have been intentionally underreporting the number of donations. In

October 2017, I spoke with a former secretary at SMFD who worked there in 2016 and 2017.

a. The secretary's duties included imputing information to the EDR system. The type of

information that the secretary would input included biographical information and the

disposition of the body. The secretary was imputing this information under Hess's user

account. Hess directed the secretary to enter all dispositions as either "Burial" or

"Cremation."

b. Eventually, the secretary recognized that there was an option for "Donation" and asked

Hess if he/she should use that option when bodies are donated through Donation

Services. Hess told the secretary, "You don't need to worry about that, let's just mark

them all as cremation." The secretary also overheard Hess tell Shirley in another

conversation that Hess was sick of the state tracking the donations.

## C. DONOR SERVICES CLIENT RECORDS

29. In interviews with prior employees of the entities, I have learned that Hess was supplying

body parts to several customers, including a man from Saudi Arabia. A former employee

that had done bank deposits for Donor Services and SMFD recalled large deposits from various different places that bought body parts, including places from other countries. Several employees reported that Hess and Shirley would brag about how much money they were getting from the donated bodies.

30. The employees reported that most of the Donor Service business transactions were arranged through email and via telephone.  Hess has two email accounts that I have identified: meg_hess@hotmail.com and montrosefuneraldirector@hotmail.com.

31. Reuters reported that records show Hess took orders for body parts via Hotmail.  This article also reported that Hess sent a price quote to an Arizona medical training lab in 2016 offering torsos for $1,000 each.  Reuters reviewed a 2013 Donor Services price list that listed a pelvis with upper legs for $1,200, heads for $500, a knee for $250, and a foot for $125.

32. In January 2018, Greg Paulos, the CEO of Innoved Institute, provided the FBI with documents detailing the specimens that Innoved purchased from Donor Services, arranged through Hess.  Innoved is a company located in Illinois that provides human tissue for scientific purposes.  The provided documents showed a total of 615 specimens—such as "Cephalus," "Shoulder w/ Arm w/ Clavicle," "Knee to Toe," "Torso Custom Cut – Intact," etc.—provided by Donor Services.  The documents also contained donor information regarding the source of the specimens.

33. Comparing Vital Statistics Records and the Innoved documents, the FBI was able to determine that body parts from at least 74 separate individuals who had passed through either Donor Services or SMFD were sold to Innoved between January 2015 and October 2017.  Of these 74 individuals, only 5 were reported as donations, according to the state records.  The other 69 individuals had been recorded as cremated.

34. Paulos said that Donor Services sends specimens to Innoved via a shipping company that picks up specimens from Hess in Montrose and drives them to the Denver airport, where they

are then flown to Chicago O'Hare airport and ultimately delivered to Innoved.  Before doing

business with Hess, Paulos conducted a site-visit of her facility at 155 Merchant Drive,

Montrose, CO.  This visit took place in either late 2014 or early 2015.  He said he wanted to

make sure that it was not a donor program "run out of someone's garage."  While there he

noted a large walk-in cooler and some chest freezers.  He also examined a random donor file,

but did not conduct an audit of donor files.  He said he was pleased that the facility appeared

clean and organized.  It appears that Hess portrayed the bodies were being freely willed to

Donor Services by the donors or their families.

35. Further preliminary analysis of the state death certificate records and of the records provided

by Innoved show in at least one instance that Hess and SMFD submitted serology reports that

indicated the body of a seventy-year-old male was not infected with Hepatitis C.  However,

on his death certificate, one contributing factor to his death was listed as Hepatitis C.  I know

from my training and experience that "body brokers" will sometimes falsify serology reports

in order to hide diseases or adverse conditions that the body carries in order to be able to sell

the body to a client.  Analysis is ongoing and serology reports have been requested from the

laboratory that Hess was using.

36. Thus far, the FBI has only identified one client of Donor Services, Innoved.  However, from

news reports regarding the entities, interviews with former employees, and recorded

conversations that Koch has had with an FBI Confidential Human Source (CHS), I know that

there are other clients of Donor Services both inside and outside the United States.  This

requested search will assist the FBI in identifying more clients of Donor Services, and any

fraudulent representations made to those clients.

**D. INTERVIEWS WITH NEXT-OF-KIN**

37. During an interview in October 2017, the prior secretary of SMFD recalled a woman who

came in to SMFD to pick up her husband's cremains.  The secretary looked for the cremains

in the embalming room storage—where they were supposed to be—but could not find them.
The secretary told the woman that he/she could not find the husband's cremains. At the time,
Hess was in Hawaii. When Hess came back, Hess told the secretary that she had meant to
have the woman sign the donor paperwork, but actually had her sign the cremation
paperwork. The secretary said that Hess then had the woman sign the donation paperwork.
The secretary believed that the husband had already been donated and that the original
intentions of the woman were to have her husband cremated and not donated.

38. I spoke with the woman. The woman's husband died in mid-May, 2017. The woman
arranged, through SMFD and Hess, to cremate her husband after seeing ads for Colorado
Cremation in the newspaper and mail. There was never any talk about donating the husband.
The woman arranged to pick up her husband's cremains on May 23rd, or May 24th. When
the woman arrived she asked the employee for her husband's cremains. The employee
searched for them, called someone else who searched for them, and then told the woman that
he/she could not find the cremains. The employee told the woman to speak with Hess when
she returned from Hawaii. Eventually, after the woman involved her daughter, Hess
delivered a bag of cremains to the woman at her home and told the woman that it was all
Hess's fault and that she had her husband's cremains locked in her safe. Hess had the
woman sign a document, but the woman could not remember what the paper was for. Hess
did not leave a copy of the document with the woman.

39. The woman and her daughter were suspicious that they did not receive the husband's true
cremains so they had them tested by the Forensic Anthropology Program Coordinator at
Western Carolina University, Nicholas Passalacqua, Ph.D. Dr. Passalacqua found that the
total weight of the cremains were not consistent with the expected weight of the husband's
cremains. Dr. Passalacqua also found foreign metal material within the cremains that may
have come from a medical device. The woman and her daughter stated that the husband did

not have any metal material on him at the time of his death nor did he ever have any medical devices in his body.

40. In 2014, a different woman had her husband cremated through SMFD and Megan Hess. Because of what the woman described as "suspicious behavior" in her dealings with Hess, she brought her husband's cremains to Taylor Funeral Services in Delta, CO. The woman showed the cremains to Kevin Lucy, who was the Delta County Coroner at that time. Lucy and three other morticians viewed the cremains; all of them said that the cremains were not human.

41. In 2017, a daughter brought the cremains of her father to Taylor Funeral Services in Delta, CO, and had Chalmer Swain and Lance Boren inspect the cremains. The father had died in 2015 and, after seeing ads on TV and in the newspaper, the family had SMFD cremate the father. Swain and Boren told the daughter that the cremains were not consistent with normal human cremains and indicated they may have rocks in them.

42. I brought the cremains of the father to Taylor Funeral Services, and discussed the cremains with Swain and Boren. Swain has been in the cremation business for over 45 years and holds a Mortuary Science degree. He is a past Delta County Coroner, and a past President of the Colorado Funeral Directors Association. Boren has been a licensed funeral director since 2001. Both agreed that further testing would be necessary, but stated that the characteristics (color, consistency, smell) of the father's cremains were not consistent with normal human cremains. The cremains of the father have been sent to the FBI laboratory for further testing.

43. A former employee of SMFD reported to the FBI that the bodies were rarely cremated with any metal identifiers, and that the name or other identifier was rarely placed on the container of cremains. Both are necessary according to Colorado State Law. Both were conveyed to customers as practices of the cremation. The former employee told the FBI that Hess has given cremains to people that could not have possibly contained the entirety of the cremains

if the entire body was cremated.  The container size was much too small for an entire body's worth of cremains.

## E. SEIZURE AND SEARCH OF COMPUTERS

44. As described above and in Attachment B, I submit that if computers or storage media are found at the Subject Premises, there is probable cause to search and seize those items for the reasons stated below.  Some of these electronic records might take the form of files, documents, and other data that is user-generated.  Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis. They may be seized and searched on-scene, and/or searched off-scene in a controlled environment.

45. For example, based on my knowledge, training, and experience, I know that a powered-on computer maintains volatile data.  Volatile data can be defined as active information temporarily reflecting a computer's current state including registers, caches, physical and virtual memory, network connections, network shares, running processes, disks (floppy, tape and/or CD-ROM), and printing activity.  Collected volatile data may contain such information as opened files, connections to other computers, passwords used for encryption, the presence of anti-forensic tools, or the presence of programs loaded in memory that would otherwise go unnoticed.  Volatile data and its corresponding evidentiary value is lost when a computer is powered-off and unplugged.

46. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the

file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

47. Also, again based on my training and experience, wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.  Data on the storage medium not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.  Computer file systems can record information about the dates files were created and the sequence in which they were created.

48. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant,

but also for evidence that establishes how computers were used, why they were used, the purpose of their use, and the purposes to which they were put, who used them, the state of mind of the user(s), and when they were used.

49. In addition, the analyst needs all assisting software (operating systems or interfaces, and hardware drivers) and any applications software, which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instructional manuals or other documentation and security devices.  Moreover, searching computerized information for evidence or instrumentalities of crime commonly requires the seizure of the entire computer's input/output periphery devices (including related documentation, passwords and security devices) so that a qualified expert can accurately retrieve the system's data in a controlled environment.

50. "User attribution" evidence can also be found on a computer and is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat,"  instant messaging logs, photographs, videos, and correspondence (and the data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

51. I know from my training and experience that digital software or hardware exists that allows persons to share digital access over wired or wireless networks allowing multiple persons to appear on the Internet from the same IP address.  Examination of these items

can reveal information about the authorized or unauthorized use of Internet connection at the premises.

52. Searching computer(s) for the evidence described in the attachment may require a range of data analysis techniques.  For example, information regarding user attribution or Internet use is located in various operating system log files that are not easily located or reviewed.  Or, a person engaged in criminal activity will attempt to conceal evidence of the activity by "hiding" files or giving them deceptive names.  As explained above, because the warrant calls for records of how a computer has been used, what it has been used for, and who has used it, it is exceedingly likely that it will be necessary to thoroughly search storage media to obtain evidence, including evidence that is not neatly organized into files or documents.  Just as a search of a premises for physical objects requires searching the entire premises for those objects that are described by a warrant, a search of this premises for the things described in this warrant will likely require a search among the data stored in storage media for the things (including electronic data) called for by this warrant.  Additionally, it is possible that files have been deleted or edited, but that remnants of older versions are in unallocated space or slack space.  This, too, makes it exceedingly likely that in this case it will be necessary to use a multitude of techniques, both on and off-scene, including more thorough techniques.

53. Based on my knowledge, training, and experience, I know that a thorough search for information stored in digital storage media requires a variety of techniques that often includes both on-site seizure and search as well as a more thorough off-site review in a controlled environment.  This variety of techniques is required, and often agents must seize most or all storage media to be searched on-scene and/or later in a controlled environment.  These techniques are often necessary to ensure the accuracy and

completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.

54. For example, the search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include the following on-site techniques (the following is a non-exclusive list, as other on-site search procedures may be used):

    a. On-site triage of computer systems to determine what, if any, peripheral devices or digital storage units have been connected to such computer systems, a preliminary scan of image files contained on such systems and digital storage devices to help identify any other relevant evidence or potential victims, and a scan for encryption software;

    b. On-site copying and analysis of volatile memory, which is usually lost if a computer is powered down, and may contain information about how the computer is being used, by whom, when, and may contain information about encryption, virtual machine software (virtual operating systems that are lost if the computer is powered down or encrypted);

    c. On-site forensic imaging of any computers may be necessary for computers or devices that may be partially or fully encrypted, in order to preserve unencrypted electronic data that may, if not immediately imaged on-scene, become encrypted and accordingly unavailable for any examination.

55. The search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include off-site techniques since it is often necessary that some computer equipment, peripherals, instructions, and software be seized and examined off-site and in a controlled environment.  This is true because of the following:

a. The nature of evidence.  As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how, when, and why a computer has been used, by whom, what it has been used for, requires considerable time, and taking that much time on premises could be unreasonable.  Also, because computer evidence is extremely vulnerable to tampering and destruction (both from external sources and from code embedded in the system as a "booby-trap"), the controlled environment of a laboratory may be essential to its complete and accurate analysis.  Searching for and attempting to recover any deleted, hidden, or encrypted data may be required to determine whether data falls within the list of items to be seized as set forth herein (for example, data that is encrypted and unreadable may not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, or (4) otherwise unlawfully possessed).

b. The volume of evidence and time required for an examination.  Storage media can store the equivalent of millions of pages of information.  Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names.  This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable.  As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Reviewing information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

c.  Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

d.  Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

e.  Need to review evidence over time and to maintain entirety of evidence.  I recognize the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and in Attachment B in order to prevent unnecessary invasion of privacy and overbroad searches.  I advise it would be impractical and infeasible for the Government to review the mirrored images of digital devices that are copied as a result of a search warrant issued pursuant to this Application during a single analysis.  I have learned through practical experience that various pieces of evidence retrieved from digital devices in investigations of this sort often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole as it develops.  In other words, the weight of each individual piece of the data fluctuates based on additional investigative measures undertaken, other documents under review and incorporation of evidence into a consolidated whole.  Analysis is content-relational, and the

importance of any associated data may grow whenever further analysis is performed. The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in sum.  Due to the interrelation and correlation between pieces of an investigation as that investigation continues, looking at one piece of information may lose its full evidentiary value if it is related to another piece of information, yet its complement is not preserved along with the original.  In the past, I have reviewed activity and data on digital devices pursuant to search warrants in the course of ongoing criminal investigations.  I have learned from that experience, as well as other investigative efforts, that multiple reviews of the data at different times is necessary to understand the full value of the information contained therein, and to determine whether it is within the scope of the items sought in Attachment B.  In order to obtain the full picture and meaning of the data from the information sought in Attachments A and B of this application, the Government would need to maintain access to all of the resultant data, as the completeness and potential of probative value of the data must be assessed within the full scope of the investigation.  As such, I respectfully request the ability to maintain the whole of the data obtained as a result of the search warrant, and to maintain and to review the data in the control and custody of the Government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time.  As with all evidence, the Government will maintain the evidence and mirror images of the evidence in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

56. Based on the foregoing, and consistent with Rule 41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to review the media on-site, the warrant I am applying for permits both on-site seizing, imaging and searching or off-site imaging

and searching of storage media that reasonably appear to contain some or all of the

evidence described in the warrant, thus permitting its later and perhaps repeated

examination consistent with the warrant.  The examination may require techniques,

including but not limited to computer-assisted scans of the entire medium, that might

expose many parts of a hard drive to human inspection in order to determine whether it is

evidence described by the warrant.

57. Because several people may share the Subject Premises, it is possible that the Subject

Premises will contain computers that are predominantly used, and perhaps owned, by

persons who are not suspected of a crime.  If it is nonetheless determined that that it is

possible that the things described in this warrant could be found on any of those

computers or storage media, the warrant applied for would permit the seizure and review

of those items as well.

58. I know from training and experience that digital storage devices can be very large in

capacity, yet very small in physical size.  Additionally, I know from training and

experience that those who are in possession of such devices also tend to keep them on

their persons, especially when they may contain contraband or other evidence of a crime.

The storage capacity of such devices can be as large as tens of gigabytes in size as further

described below, which allows for the storage of thousands of images and videos as well

as other digital information such as calendars, contact lists, programs, and text

documents.  Such storage devices can be smaller than a postage stamp in size, which

allows them to be easily hidden in a person's pocket.

### V. CONCLUSION

59. Based on the investigation described above, probable cause exists to believe that at the

place described in Attachment A, will be found evidence, fruits, and instrumentalities of

violations of Title 18, United States Code, Sections 1341, 1343, and 2314 (described on

Attachment B).

60. I, therefore, respectfully request that the attached warrant be issued authorizing the search

and seizure of the items listed in Attachment B.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.


___*s/ John Busch*_____
John Busch, Special Agent
Federal Bureau of Investigation


Submitted, attested to, and acknowledged by reliable electronic means on  February __5___, 2018.

_____                                    _____
UNITED STATES MAGISTRATE JUDGE

 Gordon P. Gallagher


Application for search warrant was reviewed and is submitted by AUSA Jeremy Chaffin.